## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J.G.G.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

G.F.F.,*
Orange County Jail
110 Wells Farm Road
Goshen, NY 10924;

J.G.O.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

W.G.H.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

J.A.V.,*
El Valle Detention Facility
1800 Industrial Drive
Raymondville, TX 78580;

*Plaintiffs–Petitioners*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, The White House,
1600 Pennsylvania Avenue, NW, Washington,
D.C. 20500;

PAMELA BONDI, Attorney General of the United
States, in her official capacity, 950 Pennsylvania
Ave., NW, Washington, DC, 20530;

KRISTI NOEM, Secretary of the U.S. Department
of Homeland Security, in her official capacity, 245
Murray Lane SW, Washington, DC 20528;

Case No. _____

**CLASS ACTION COMPLAINT
AND PETITION FOR WRIT
OF HABEAS CORPUS**

U.S. DEPARTMENT OF HOMELAND
SECURITY, 245 Murray Lane SW, Washington,
DC 20528;

MADISON SHEAHAN, Acting Director and
Senior Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement, in her official capacity, 500 12th
Street, SW, Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, 500 12th St. SW, Washington,
DC 20536;

MARCO RUBIO, Secretary of State, in his official
capacity, 2201 C Street, NW, Washington, DC
20520;

U.S. STATE DEPARTMENT, 2201 C Street, NW,
Washington, DC 20520;

*Defendants–Respondents*.

---

\* Motion for these Plaintiffs to proceed under pseudonym has been concurrently filed with this
complaint.

## INTRODUCTION

1.      Plaintiffs-Petitioners ("Plaintiffs") are Venezuelan men in immigration custody threatened with imminent removal under the President's expected Proclamation invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times in our Nation's history: the War of 1812, World War 1 and World War II.

2.      The Proclamation is expected to authorize "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without any opportunity for judicial review.  It also contorts the plain language of the AEA: arrivals of noncitizens from Venezuela are deemed an "invasion" or "predatory incursion" by a "foreign nation or government," where Tren de Aragua, a Venezuelan gang, is deemed to be sufficiently akin to a foreign nation or government.

3.      But the AEA has only ever been a power invoked in time of war, and plainly only applies to warlike actions: it cannot be used here against nationals of a country—Venezuela— with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

4.      The government's Proclamation would allow agents to immediately put noncitizens on planes without any review of any aspect of the determination that they are Alien Enemies.  Upon information and belief, the government has transferred Venezuelans who are in ongoing immigration proceedings in other states, bringing them to Texas to prepare to summarily remove them and to do so before any judicial review—including by this Court.  For that reason, Plaintiffs-Petitioners and the putative class that they represent seek this Court's intervention to temporarily restrain these summary removals, and to determine that this use of the AEA is unlawful and must be stopped.

## JURISDICTION AND VENUE

5.      This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*; the Immigration and Nationality

Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against

Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.

L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to

8 U.S.C. § 1231); the All Writs Act, 28 U.S.C. § 1651, and the Fifth Amendment to the U.S.

Constitution.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 et seq. (habeas

corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28

U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this

suit. 5 U.S.C. §§ 702, 706.

7.      The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the

Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; 28 U.S.C. § 1331; the All Writs Act, 28

U.S.C. § 1651; and the Court's inherent equitable powers.

8.      Venue is proper in this District under 28 § 1391(e)(1) because Defendants are

agencies of the United States or officers of the United States acting in their official capacity,

Defendants reside in this District, and a substantial part of the events or omissions giving rise to

the claim occurred in this district.

## PARTIES

### A.  Plaintiffs

9.      Plaintiff-Petitioner J.G.G., a Venezuelan national who is detained at El Valle Detention Center in Texas and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have done so previously to him.  During an interview with ICE, he was detained because the officer erroneously suspected that J.G.G. was a Tren de Aragua member on account of his tattoos.  J.G.G. is a professional tattoo artist, and his two tattoos a rose and skull on his leg, which cover a monkey tattoo that he no longer liked, and an eye with a clock inside it, which a fellow tattoo artist applied as practice—neither are associated with Tren de Aragua.  While he was awaiting a hearing on the merits of his applications for protection in Adelanto, California, J.G.G. was awakened at 2:00 am on March 6, 2025, and he was told that he was being released and that he had to sign documents that were available only in English to receive his property.  J.G.G. then signed documents under false pretense.  Instead of being released, J.G.G. was abruptly and without explanation transferred to El Valle Detention Center in Texas.  While in El Valle, he was awakened at 3:00am on March 14, 2025, and told without explanation that he was going to be transferred elsewhere.  He was not transferred because the plane had malfunctioned.  J.G.G. fears that he will be removed under the Proclamation because he has tattoos, despite not being involved whatsoever with Tren de Aragua and despite his ongoing asylum proceedings.

10.      Plaintiff-Petitioner J.A.V. is a Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal

under the expected Proclamation.  J.A.V. is seeking asylum because of his political views and fear of harm and mistreatment from multiple criminal groups, including the Tren de Aragua.  At his asylum interview on February 27, 2025, he was arrested and interrogated by ICE, during which time ICE questioned him about Tren de Aragua.  J.A.V. is not and has never been a member of Tren de Aragua—he was in fact victimized by that group and the group is the reason he cannot return to Venezuela.  Still, ICE proceeded to detain J.A.V. at Moshannon Valley Processing Center in Pennsylvania.  On March 9, 20205, J.A.V was transferred with a group of other Venezuelans to El Valle Detention Center in Texas.  Notwithstanding the fact that J.A.V. has a master calendar hearing scheduled for March 19, 2025, he was told on March 14, 2025, that that he was being moved in preparation for a later flight with a group of other Venezuelans. J.A.V has since been informed that he will be put on a plane on Saturday March 15, 2025, or Sunday March 16, 2025.  J.A.V fears being deported, being unable to speak with his attorney, and being denied adequate medical care.

11.     Plaintiff-Petitioner G.F.F. is a 21-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  G.F.F. entered the United States in May 2024.  He was released on his own recognizance after a credible fear interview.  G.F.F. was arrested and detained in New York.  Upon his detention, DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua."  On March 9, 2025, he was moved to Moshannon and then quickly to El Valle.  Only Venezuelans were transferred with him.  G.F.F.'s final individual immigration hearing is scheduled for March 17, 2025.  On March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night on March 14, 2025.

12.     Plaintiff-Petitioner W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  W.G.H. lives in Brooklyn, New York, with his wife and his stepdaughter.  W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de Aragua.  On February 20, 2025, ICE arrested W.G.H. and detained him at Moshannon.  He was assigned an attorney from Brooklyn Defender Services.  On March 7, 2025, ICE filed a Form I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate."  He is not a member of Tren de Aragua.  On March 9, 2025, he was abruptly transferred to El Valle, where many other Venezuelans were also present.  W.G.H. was scheduled to have a court hearing on March 12, 2025, but W.G.H. was not produced.  W.G.H.'s next immigration court hearing is scheduled for March 26, 2025.  He has been told that he will be taken to a plane on March 15 or 16.  He is extremely afraid of returning to Venezuela.

13.     Plaintiff-Petitioner J.G.O. is a 32- year- old Venezuelan national who is detained at El Valle Detention Center in Texas, and who, upon information and belief, is at imminent risk of removal under the expected Proclamation.  On January 30, 2025, ICE officers arrested and detained J.G.O.  He was later transported to Moshannon.  On March 8, 2025, he was abruptly transferred to El Valle in the middle of the night.  On March 12, J.G.O. was told to sign papers in English, which is not his native language.  He refused to sign.  ICE officer told J.G.O. that he will be deported on the night of March 14, 15, or 16.

**B. Defendants**

14.     Defendant Donald Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Proclamation under the Alien Enemies Act.

15.     Defendant Pamela J. Bondi is the U.S. Attorney General at the U.S. Department of Justice, which is a cabinet-level department of the United States government.  She is sued in her official capacity.

16.     Defendant Kristi Noem is the Secretary of the U.S. Department of Homeland Security, which is a cabinet-level department of the United States government.  She is sued in her official capacity.  In that capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

17.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. Its components include Immigration and Customs Enforcement ("ICE"). Defendant DHS is a legal custodian of Plaintiffs.

18.     Defendant Madison Sheahan is the Acting Director and Senior Performing the Duties of the Director of ICE.  Defendant Sheahan is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Defendant Sheahan is a legal custodian of Plaintiffs. Defendant Sheahan is sued in her official capacity.

19.     Defendant ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Defendant ICE is a legal custodian of Plaintiffs.

20.     Defendant Marico Rubio is the Secreaty of State at the U.S. Department of State. He is sued in his official capacity.

21.     Defendant U.S. Department of State, which is a cabinet-level department of the United States government.

## BACKGROUND

**The Alien Enemies Act**

22.    The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

23.    The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

24.    The AEA can thus be triggered in only two situations.  The first is when a formal declared war exists with a foreign nation or government.  The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

25.    To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion.  *Id.*

26.    The AEA also provides that noncitizens must be permitted the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States.  If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality."  *Id.* § 22.

7

27.    Under the AEA, noncitizens who "refuse or neglect to depart" are subject to removal. *Id.* § 21.

28.    The Act has been used only three times in American history, all during actual or imminent wartime.

29.    The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

30.    The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

31.    The AEA was used again during World War II, though it was never used as a widespread method of removal.

32.    On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States. The president issued regulations applicable to Japanese nationals living in the United States. The next day Congress declared war on Japan.

33.    On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy. The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people. Three days later Congress voted unanimously to declare war against Germany and Italy.

34.    Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

35.    Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

36.    It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States."  The Department of Justice subsequently issued regulations laying out the removal process.  *See* 10 Fed. Reg. 12189 (Sept. 28, 1945).  It was never used as a widespread method of removal.

**Systemic Overhaul of Immigration Law in 1952**

37.    Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

38.    The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States.  The INA provides the exclusive procedure by which the government may determine whether to remove an individual.  8 U.S.C. § 1229a(a)(3).

39.    In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines certain forms of humanitarian protection.

40.    First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for

asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion. 8 U.S.C. § 1101(a)(42)(A).

41.    Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds. 8 U.S.C. § 1231(b)(3). That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. The relevant form of relief, known as "withholding of removal," requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

42.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See* 8 U.S.C. § 1231 note. That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242. As with withholding of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met. There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

43.    Upon information and belief, President Trump will imminently sign a Proclamation invoking the Alien Enemies Act and promulgate accompanying regulation to implement it ("AEA Process").

44.    Upon information and belief, the Proclamation characterizes Tren de Aragua as a *hybrid criminal state* engaged in an invasion and predatory incursion into the United States as a basis to invoke the AEA.

45.     Upon information and belief, it seeks to characterize Tren de Aragua, a criminal organization, as a foreign nation or government, and will not name Venezuela itself as the "foreign government" as the target of the AEA invocation.

46.     Upon information and belief, the Proclamation is expected to allege that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

47.     Upon information and belief, the Proclamation is expected to state that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

48.     Upon information and belief, the Proclamation will further assert that such noncitizens are chargeable with acts of actual hostility and declare them to be a danger to public safety and peace, making them subject to immediate apprehension, restraint, and removal.

49.     Upon information and belief, to determine who is an "alien enemy" subject to the Proclamation, an ICE officer will complete and sign a standardized checklist, which is then attested to by a supervising officer. The checklist, which utilizes a points-based methodology adapted from Bureau of Prisons forms, documents whether the noncitizen satisfies all applicable criteria. Though the noncitizen must then sign the checklist, it will not be translated into Spanish or into any other language.

50.     Upon information and belief, after signing the checklist document, the noncitizen is subject to removal to any location as may be directed but consistent with applicable laws.

51.     Upon information and belief, noncitizens subject to the Proclamation will not be afforded credible fear interviews for asylum, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

52.     Tren de Agua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government, no does it receive support from the government.

53.     The United States is not in a declared war with Venezuela.  The United States cannot declare war against Tren de Aragua because it is not a nation.  And neither Venezuela nor Tren de Aragua have invaded or threatened to invade the United States.

54.     There is a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

55.     As a result, countless Venezuelans are at imminent risk of deportation without any hearing or meaningful review, regardless of their ties to the United States or the availability of claims for relief from and defenses to removal.

## CLASS ALLEGATIONS

56.     Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

57.     Plaintiffs seek to represent the following Proposed Class: All noncitizens who were, are, or will be subject to the Alien Enemies Act Proclamation and/or its implementation.

58.     The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Thousands of nationals from Venezuela will potentially be subjected to summary removal under the Proclamation and its implementation by Defendants.  The proposed class also includes numerous future noncitizens who will enter the United States and will be subjected to the Proclamation.

59.     The class satisfies the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the AEA, INA, and the statutory protections Congress has enacted.  The suit also raises

questions of law common to members of the proposed class, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers.

60.    The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class.  Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the AEA, the INA, the APA, and due process.

61.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  The representative Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation.  In defending their rights, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

62.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union and the Democracy Forward Foundation.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

63.    The proposed class also satisfies Rule 23(b)(2).  Defendants have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under the Proclamation rather than affording them the protection of immigration laws.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

**HARM TO PLAINTIFFS**

64.     J.G.G. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality and his tattoos, despite his tattoos having no connection to Tren de Aragua.  He has ongoing immigration proceedings for asylum, withholding of removal, and CAT protection that ICE is preventing him from continuing.  Mr. Hernandez has no involvement whatsoever with Tren de Aragua, but he is at risk of summary removal under the Proclamation.

65.     J.A.V. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality, despite not being a member of Tren de Aragua.  He has a master calendar hearing scheduled for his asylum application for March 19, 2025.  J.A.V. has no involvement whatsoever with Tren de Aragua, but he is at risk of summary removal under the Proclamation.

66.     G.F.F. fears that he is at immediate risk of removal under the expected Proclamation because DHS filed an I-213 identifying him as an "associate/affiliate of Tren de Aragua."  G.F.F. entered the United in May 2024 and was released on his own recognizance after a credible fear interview.  After he was initially arrested and detained in New York, G.F.F. was transferred to El Valle Detention Center in Texas.  G.F.F. is at risk of summary removal under the Proclamation.  Indeed, on March 14, 2025, ICE officers told G.F.F. that he was going to be deported in the middle of the night on March 14, 2025.

67.     W.G.H. fears that he is at immediate risk of removal under the expected Proclamation because DHS filed an I-213 identifying him as a "Tren de Aragua gang associate."  He is not a member of Tren de Aragua.  W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de Aragua.  W.G.H.'s next

immigration court hearing is scheduled for March 26, 2025, but is currently detained at El Valle Detention Center in Texas. W.G.H. is at risk of summary removal under the Proclamation and told that he will be taken on a plane March 15 or 16. He is extremely afraid of returning to Venezuela.

68.     J.G.O. fears that he is at immediate risk of removal under the expected Proclamation because of his Venezuelan nationality. He is currently detained at El Valle Detention Center. On March 12, J.G.O. was told to sign papers in English, which is not his native language. He refused to sign. ICE officer told J.G.O. that he will be deported on the night of March 14, 15, or 16. J.G.O. is at risk of summary removal under the Proclamation.

69.     Each of the foregoing paragraphs is incorporated by reference in each of the following claims.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 21
### (All Defendants)

70.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

71.     The AEA does not authorize the removal of noncitizens from the United States absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory incursion" into the United States by a "foreign nation or government." *See* 50 U.S.C. § 21. The expected Proclamation on its face mandates Plaintiffs' removal under the AEA where those preconditions have not been met.

72.     The AEA Process, which was purportedly established pursuant to the authority of 50 U.S.C. § 21, was not authorized by that law.

73.    The application of the AEA Process to Plaintiffs is therefore ultra vires.  *See* 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Defendants)

74.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

76.    The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

77.    The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

78.    The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.  Because the AEA Process provides for the removal of Plaintiffs without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

79.    As a result, the application of the AEA to Plaintiffs, which will result in their removal from the United States, is contrary to law.  *See* 5 U.S.C. § 706(2)(A).

80.    In addition, by refusing to grant Plaintiffs access to the procedures specified in the INA, Defendants have withheld and unreasonably delayed actions mandated by the statute.  5 U.S.C. § 706(1).

16

**THIRD CLAIM FOR RELIEF**

**Violation of 8 U.S.C. § 1158, Asylum
(All Defendants)**

81.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

82.    The INA provides, with certain exceptions, that "[a]ny alien who is physically

present in the United States or who arrives in the United States (whether or not at a designated

port of arrival and including an alien who is brought to the United States after having been

interdicted in international or United States waters), irrespective of such alien's status, may apply

for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8

U.S.C. § 1158(a)(1).

83.    Defendants' application of the AEA Process to Plaintiffs prevents them from

applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law.

*See* 5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**

**Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
(All Defendants)**

84.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

85.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C.

§ 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that

they would face persecution.

86.    Defendants' AEA Process and regulations violate the withholding of removal

statute because it does not provide adequate safeguards to ensure that Plaintiffs are not returned

17

to a country where it is more likely than not that they would face persecution. As a result, Defendants' actions against Plaintiffs are contrary to law. *See* 5 U.S.C. § 706(2)(A).

87.    In addition, by refusing to grant Plaintiffs the procedural protections to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), codified at 8 U.S.C. § 1231 note
### (All Defendants)

88.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

89.    FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

90.    Defendants' AEA Process and regulations violate FARRA because it does not provide adequate safeguards to ensure that Plaintiffs are not returned to a country where it is more likely than not that they would face torture. As a result, Defendants' actions against Plaintiffs are contrary to law. *See* 5 U.S.C. § 702(2)(A).

91.    In addition, by refusing to grant Plaintiffs the procedures to which they are entitled, Defendants have withheld and unreasonably delayed actions mandated by the statute. 5 U.S.C. § 706(1).

## SIXTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (All Defendants except Defendant Trump)

92.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

93.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion."  5 U.S.C. § 706(2)(A).

94.    Defendants' actions are arbitrary and capricious.  Defendants have failed to consider relevant factors in applying the AEA Process to Venezuelans, including their fear of persecution and torture in their home country; relied on factors Congress did not intend to be considered; and offered no sufficient explanation for their decision to remove them from this country.

95.    Plaintiffs' subjection to the AEA Process is arbitrary and capricious because it also departs from the agency's existing policies prohibiting the return of individuals who fear persecution or torture, without providing a reasoned explanation for departing from these policies.

## SEVENTH CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 22
### (All Defendants)

96.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

97.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

98.    The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing.  *See* 50 U.S.C. § 22.  The Proclamation on its face denies Plaintiffs any time under

Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

99.    The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires*.

100.    The application of the AEA Process to Plaintiffs is contrary to law.  **EIGHTH**

## CLAIM FOR RELIEF

### Violation of Due Process Under the Fifth Amendment
### (All Defendants)

101.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

102.    The Due Process Clause of the Fifth Amendment provides in relevant part that: "No person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

103.    In denying Plaintiffs meaningful procedural protections to challenge their removal, the Proclamation violates due process.

104.    The Proclamation on its face also denies Plaintiffs any time to settle their affairs before departing and thus violates the due process.

## NINTH CLAIM FOR RELIEF

### Violation of Habeas Corpus
### (All Defendants)

105.    Detainees have the right to file petitions for habeas corpus to challenge the legality of their detention or raise other claims related to their detention or to the basis for their removal.

106.    The detention of Plaintiffs under the Alien Enemies Act has violated and continues to violate their right to habeas corpus. See U.S. Const. art. I, § 9, cl. 2 (Suspension Clause); 28 U.S.C. § 2241.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray this Court to:

a.  Issue permanent injunctive relief prohibiting Defendants from removing Plaintiffs pursuant to the Alien Enemies Act Proclamation;

b.  Grant a temporary restraining order to preserve the status quo pending further proceedings;

c.  Declare unlawful the AEA Process;

d.  Enter an order enjoining Defendants from applying the AEA Process;

e.  Enter an order providing relief by ordering that Defendants to stay their removals under the Proclamation and remove anyone subject to the Proclamation from the AEA Process;

f.  Grant a writ of habeas corpus to Plaintiffs that enjoins Defendants from removing them under the AEA,

g.  Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

h.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: March 15, 2025

Noelle Smith*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski*
Omar C. Jadwat*
Hina Shamsi (D.D.C. Bar No. MI0071)
Patrick Toomey*
Sidra Mahfooz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich*
Skye Perryman (D.C. Bar No. 984573)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro bono representation certificates or
Pro hac vice motions forthcoming*